UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RUFUS SPEARMAN,

        Petitioner,

                                   CASE NO. 05-CV-40006-FL
v.                                  JUDGE PAUL V. GADOLA
                                   MAGISTRATE JUDGE PAUL J. KOMIVES

WILLIE SMITH,

        Respondent.[1]

_____/


## REPORT AND RECOMMENDATION

*Table of Contents*

I.   RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.  REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.   *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.   *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    C.   *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    D.   *Right to Counsel (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        1.     *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        2.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    E.   *Defective Oath (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    F.   *Weight and Sufficiency of the Evidence (Claims III & IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        1.     *Sufficiency of the Evidence (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
             a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
             b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        2.     *Weight of the Evidence (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    G.   *Reading Back of Testimony (Claim V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    H.   *Prosecutorial Misconduct (Claim VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        1.     *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        2.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
             a. Shifting Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
             b. Commenting on Petitioner's Silence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
             c. Denigrating Petitioner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
             d. Vouching for Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
             e. Misstating the Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
             f. Arguing Facts Not in Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
             g. Appealing to Civic Duty and Sympathy of Jury . . . . . . . . . . . . . . . . . . . . . . . 34
    I.   *Ineffective Assistance of Counsel (Claim VII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

---

[1]By order entered this date, Willie Smith has been substituted for Thomas Birkett as the proper respondent in this case.

       1.     *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
       2.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
          a. Failure to Conduct Adequate Investigation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
          b. Failure to Move to Suppress Testimony of Darshuan Barksdale . . . . . . . . . . . . . . 38
          c. Failure to Object to Appearance in Jail Clothing . . . . . . . . . . . . . . . . . . . . . . . . . 39
  J.     *Cumulative Error (Claim VIII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
  K.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*     *     *     *     *

I.    <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.    <u>REPORT</u>:

A.    *Procedural History*

    1.    Petitioner Rufus Spearman is a state prisoner, currently confined at the Ionia Maximum Correctional Facility in Ionia, Michigan.

    2.    On September 7, 2000, petitioner was convicted of one count of first degree murder, MICH. COMP. LAWS § 750.316; and one count of possessing a firearm during the commission of felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Wayne County Circuit Court. On September 22, 2000, he was sentenced to a mandatory term of life imprisonment on the murder conviction, and to a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction..

    3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

    I.    APPELLANT RUFUS SPEARMAN WAS DENIED BOTH HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO BE REPRESENTED BY COUNSEL OF HIS OWN CHOOSING WHERE THE TRIAL COURT REFUSED TO ADJOURN THE CASE AND FORCED APPELLANT TO GO TO TRIAL WHERE THERE WAS A BREAKDOWN IN THE ATTORNEY-CLIENT RELATIONSHIP WITH THE APPOINTED COUNSEL.

2

II.     THE COURT CLERK ADMINISTERED A DEFECTIVE OATH TO THE
        JURORS AT THE COMMENCEMENT OF THE APPELLANT'S TRIAL
        WHICH CONSTITUTES A STRUCTURAL ERROR MANDATING A
        REVERSAL OF HIS CONVICTIONS.

III.    THERE WAS INSUFFICIENT EVIDENCE AS A MATTER OF LAW TO
        ESTABLISH APPELLANT RUFUS SPEARMAN'S CONVICTION FOR
        PREMEDITATED MURDER IN THE FIRST DEGREE AS REQUIRED
        BY THE DUE PROCESS CLAUSE.

IV.     THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING THE
        MOTION FOR NEW TRIAL WHERE THE GUILTY VERDICT WAS
        AGAINST THE GREAT WEIGHT OF THE EVIDENCE.

V.      THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY
        FORECLOSING ANY POSSIBILITY OF HAVING TESTIMONY
        REREAD AND DENIED APPELLANT RUFUS SPEARMAN OF A FAIR
        TRIAL IN VIOLATION OF BOTH [THE] STATE AND FEDERAL
        CONSTITUTIONS.

VI.     APPELLANT RUFUS SPEARMAN WAS DENIED A FAIR TRIAL BY
        THE TRIAL PROSECUTOR'S MISCONDUCT THROUGHOUT THE
        TRIAL AND DURING HIS ARGUMENTS IN VIOLATION OF THE DUE
        PROCESS CLAUSE OF BOTH THE FEDERAL AND STATE
        CONSTITUTIONS.

VII.    APPELLANT RUFUS SPEARMAN WAS DENIED THE EFFECTIVE
        ASSISTANCE OF COUNSEL GUARANTEED HIM BY THE FEDERAL
        AND STATE CONSTITUTIONS AT TRIAL.  THEREFORE, HE IS
        ENTITLED TO A NEW TRIAL AND/OR A REMAND FOR A HEARING
        PURSUANT TO PEOPLE V. GINTHER 390 MICH 436 (1973).

VIII.   THE CUMULATIVE EFFECT OF THE FOREGOING ERRORS DENIED
        APPELLANT RUFUS SPEARMAN OF A FAIR TRIAL IN VIOLATION
        OF DUE PROCESS OF LAW AND REQUIRES REVERSAL.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Spearman*, No. 230510, 2003 WL 1904348 (Mich. Ct. App. Apr. 17, 2003) (per

curiam).

        4.      Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan

Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard

order.  *See People v. Spearman*, 469 Mich. 950, 671 N.W.2d 52 (2003).

     5.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus

on January 10, 2005.  As grounds for the writ of habeas corpus, he raises the eight claims that he

raised in the state courts.

     6.      Respondent filed his answer on July 20, 2005.  He contends that petitioner's claims

are without merit.  Additionally, respondent argues that petitioner's second and fifth claims are

barred by petitioner's procedural default in the state courts.

B.     *Factual Background Underlying Petitioner's Conviction*

     Petitioner was charged and convicted in connection with the November 5, 1999, fatal

shooting of Toma Johnson in a residence on Edinborough in Detroit.  The trial testimony was

accurately summarized in the prosecutor's brief on appeal in the Michigan Court of Appeals:

> Cassandra McIntosh testified her daughter was Toya.  Toma Johnson, the deceased, was her daughter's boyfriend.  Trandose Murphy had been her daughter's boyfriend before Toma.  McIntosh lived at 19324 Edinborough.  On November 5th, 1999, she was in the house with Toma and her son.  Toya was not home.  Toma was not getting along with some people in the Barksdale family.  She said Toma had been there since about 9 p.m.  Her son and Toma were in the basement watching television.  McIntosh was upstairs and said she had a baby monitor which allowed her to hear sounds downstairs.  About 10:30 p.m., she said she heard a knock on the front door.  Toma came up from the basement.  McIntosh stated she heard a voice ask for Toya, first stating "It's Tee."
>
> She could not recognize the voice although Tee was Murphy's nickname.  She said she could recognize Murphy's voice and that he always came to the side door of the house.  McIntosh heard Toma unlock the front door and open it.  Toma said "She's not here," referring to Toya.  Next, McIntosh heard a gunshot and something fall to the floor.  After a few minutes, McIntosh called out for Toma and her son.  There was no answer.  When she ran downstairs, her son came up from the basement.  Toma was lying on the floor.  McIntosh shut and locked the front door and called the police.  She told the jury she heard some whispering also at the front door before the shot.  She explained that there was a beer and wine store on the corner, just a few minutes away.  She did not talk with the Barksdales about the

details of the incident.

Vaneeka Barksdale testified that Darshuan was her cousin and Vikki Woods was her sister. She said defendant was Darshuan's boyfriend and they had a child together. On November 5, 1999, defendant, Darshuan and the baby came over to Vikki's. It was Vikki's birthday. They came over about 6-7 p.m. The address was 19819 Harlow. It was maybe one mile from Edinborough.

After a while, defendant and Darshuan left the house. The said they were going to pick up Tweety, Darshuan's best friend. Defendant was drinking a lot. Defendant and Darshuan came back about 1-1 ½ hours later. Defendant ran straight to Vikki's basement, walking a bit fast. Afterward, he had on different clothes; blue pants and a white t-shirt. The pants belonged to Barksdale's cousin. When Barksdale asked Darshuan about the new clothes, Darshuan was upset and crying. She did not tell Barksdale anything. Barksdale identified People's exhibit 12 as the black sweatshirt and pants defendant had been wearing before he left and came back. She saw defendant wiping his shoes with a rag, which she said People's exhibit 13 could be. Upstairs, defendant made a toast, saying "One shot to the dome."

The next day, defendant asked Barksdale if he killed the right person. Defendant told her the details. Defendant was bragging that Toma was shot. Defendant said he shot Toma because Darshuan told him Toma had hit her. Barksdale said defendant asked her about the problem, and she told him only Toya had hit Darshuan. Defendant told Barksdale he had knocked on the door, asked for Toya, and Toma answered. At first Toma did not open the door, but when he opened it, he said Toya was not home. Defendant stated he then asked if Toma was there, and Toma tried to shut the door. Defendant pushed it open and shot Toma. He bragged about shooting him in the eye. When he saw the body drop, he ran to a car parked around the corner were Darshuan was seated. Defendant explained he used a .38 cal. handgun and said he shot one time. He said he knew Murphy's nickname.

In her statement, Barksdale said defendant had stated for people he did not like, "one shot to the dome." She saw defendant put his clothing in the bag belonging to Bud, which was in the basement. Later, she said defendant asked her if she had really wanted him to kill Toma. She testified defendant put his gun into his daughter's baby wipes. On cross-examination, she said defendant has asked Vikki if he could wear her clothes. He put Vikki's coat on over the t-shirt. Barksdale told the jury defendant had threatened her. Defendant told Darshuan to get Barksdale out of the house since she was the only witness and he would have to kill her. The court, out of the presence of the jury, stated that defendant continued to wear the jail clothing with Wayne County Jail on the back. He had been given an opportunity to wear a blue blazer.

Vikki Woods said defendant was the father of her cousin's baby. Tee was Toya's ex-boyfriend. Defendant was at Vikki's house on November 5, and had come over with Darshuan and the baby. Woods said he left about 8:30 and was gone maybe 1 ½ to 2 hours. When he came back, he went into the basement. When he came out, he had on a white t-shirt. She did not know if he had the same pants on. Defendant had a drink and made a toast: "One shot to the dome." Defendant asked

Woods if he could wear her coat. He told her he had just killed somebody. He said it was Toma. Defendant described Toma. Woods said defendant wanted to go to her mother's house. Defendant told Woods details of the killings: how he had knocked on the door, asked if Toya was there, how Toma said she was not, how Toma hesitated and how defendant shot him. He said he shot Toma in the area of the left eye.

Woods said she saw the gun defendant had. It was a little gun, with a rusty color. She watched him get the gun out of the basement. She believed People's exhibit 11 was the weapon. It was admitted without objection. Defendant had but the gun in his baby's diaper bag, in the wipes. On cross-examination, she said Bud came over to get clothes from the house.

Outside the presence of the jury, the court said a copy of the ballistics report was being made. It was to be provided to defense counsel. With the jury back, a stipulation was entered that a firearms examiner would say the slug from the deceased was classified as a .38/.375 metal jacket bullet, class 6-L.

Officer Susan Levalley said she worked in firearms identification. She identified evidence tag 581397, a .38 special, nickel-plated derringer, two shot, class 6-L. She also identified two .38 cartridges, metal jacket, hydroshock. She said People's 14 was the slug taken from the deceased. She told the jury .38 and .357 were very close in diameter. Hydroshock are hollow point bullets which do more damage upon impact. Levalley testified she had cleaned the weapon because it had rust and mud on it. She was unable to make an accurate comparison because of the condition of the gun. She said it was probable that the bullet from the deceased could have matched the gun in evidence.

Hayden Dannug, a trace evidence and serology expert, testified he examined a towel, a hooded black sweatshirt and a pair of khaki pants. They all tested negative for blood. He ran a gunshot residue test, using sampling stubs. There was no residue found on the towel, but some was found on the pants and the sweatshirt. Dannug said a gunshot residue test was done on Tradose Murphy. No residue was detected. The test was done about 6 hours after the shooting.

William Niarhos said he was an evidence technician and went to the scene of the shooting. He performed the residue test on Murphy. Murphy told him he had not washed his hands. At the scene, Niarhos saw the deceased, who had a gunshot wound over his left eye. There was charring of the skin around the eye.

Officer Wendy Sierra told the jury she had a run on August 12 about a found weapon. She met with Darshuan Barksdale who handed over a 2 shot derringer. Exhibit 11 appeared to be that weapon. It was dirty when Sierra received it and was inside a workglove, which was caked in dirt, full of mud. She said the gun was loaded with two .38 cal. hollowpoints, which were jammed in.

Darshuan Barksdale told the jury she had a baby with defendant and had known him four years. Defendant knew Toya lived at the McIntosh house. Barksdale had a problem with Toya. Defendant knew she and Toya had fought. Barksdale told him about the fight, which involved a knife. She went to Woods' house on November 5 with defendant. He was drinking and smoking marijuana, and

6

was drunk.  She left with him to go to a party store near the McIntosh Edinborough address, about 10 houses away.  She said they parked the car maybe 5 houses from the scene.  She heard a gunshot after defendant left the car.  When she asked defendant about the shot, he said nothing.  Back at the Woods' house, defendant went to the basement and changed his clothing.  He put a gun in the ceiling.  The gun was small and silver, with a black handle.  Before that, defendant had been wearing the clothing in exhibit 12.  He changed and stashed the clothes in a bag in Vikki's basement.  Defendant was in a hurry to change his clothing.  He told her and Woods what he had done before he changed clothes.  He volunteered the information.

Defendant told her he had just shot Toma in the eye.  He explained he had knocked on the door and when the guy tried to close the door, he said he had "something for you," and shot him.  He went around the corner and got into the car.  Later, he put the gun in the ceiling and retrieved it the next day, November 6th.  He made a toast after changing his clothes, saying, "One shot to the dome."  While in jail, defendant told Barksdale the gun was in a glove in an alley.  She found it, in a glove, buried in dirt.  She was scared of defendant.  She told the police about the gun.

On the next day of trial, the court again explained on the record, outside the presence of the jury, that defendant insisted on wearing the jail clothing.  On cross-examination, Barksdale told the jury Vaneeka had fought with Toma.  She saw defendant put the gun in the ceiling in Woods' basement.  She did not tell the police about the weapon until August 12.  After her testimony concluded, the People rested.

Defense counsel made a motion for directed verdict, which the court denied.  Counsel said defendant would testify.

Defendant said that while at Woods' house, Vaneeka said they should see who could drink the most shots in 10-15 seconds.  Defendant said he won, and then stated: "Seven shots to the dome," indicating the number of shots he had consumed.  He admitted leaving the place, but said they went to find marijuana, and he expounded on the places they drove to.  He explained when they came back, Bud came in and was wearing the clothing from exhibit 12.  On cross-examination, he told the jury all three prosecution witnesses were lying on him.  He admitted the clothing was an important detail but he never brought it up until the day of trial.  He never told the police about Bud and the clothing.  He did not mention Bud and the clothing in his February letter to the court.  In that letter, defendant said Murphy did the shooting, but at trial, he said Bud might have done it.  His examination was held in November, 1999, so he had the information about the clothing then.  The defense rested.

Appellee's Br. on Appeal, in *People v. Spearman*, No. 230510 (Mich. Ct. App.), at 5-14 (footnotes omitted).  Following closing arguments and after being instructed by the court, the jury deliberated for over two days, eventually returning a verdict of guilty on both charges.

C.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.

8

However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich.

2002) (Tarnow, J.).

D.       *Right to Counsel (Claim I)*

Petitioner first contends that he was denied the right to counsel of his choice when the court refuses to grant more than a two day continuance for his newly retained counsel to prepare for trial. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.       *Clearly Established Law*

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. CONST. amend. VI.  This right contemplates a corollary right to the counsel of one's choice, and thus a criminal defendant who has the desire and the financial means to retain his own counsel generally "'should be afforded a fair opportunity to secure counsel of his choice.'"  *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1351 (6th Cir. 1993) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)).  This right, however, is not absolute, and "is circumscribed in several important respects."  *Wheat v. United States*, 486 U.S. 153, 159 (1988).  Importantly, the right to counsel of one's choice "must be balanced against the court's authority to control its own docket, and a court must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court."  *United States v. Krzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988); *see also*, *Lockett v. Arn*, 740 F.2d 407, 413 (6th Cir. 1984) ("Although a criminal defendant is entitled to a reasonable opportunity to obtain counsel of his choice, the exercise of that right must be balanced against the court's authority to control its docket.").

Further, as the Supreme Court has explained, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the

Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159. Thus, "in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'" *Id.* (quoting *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984).

  2. *Analysis*

  The parties appeared for trial on August 28, 2000, the date which had been scheduled for the start of the trial. At that time, the following exchange took place:

| | |
|---|---|
| MR. EVANS: | . . . . Your Honor, I was called by Ms. Colthirst on Friday afternoon and was informed that Ms. Colthirst or Mr. Spearman's father had retained Ms. Colthirst to represent him. I did call the court here. You left already – |
| THE COURT: | Yeah, I had to go [to the] Southfield Clerk's Office. |
| MR. EVANS: | – to get some other business I understand, and so I wasn't able to reach the court.<br><br>  As far as being prepared to go to trial today, I have read the file over. I can go to trial today. |
| THE COURT: | Yeah, I know you're prepared to go to trial. |
| MR. EVANS: | But with this new wrinkle, I have no objection to Ms. Colthirst coming into the case and me withdrawing. |
| THE COURT: | As long as she's prepared to proceed today to trial, that's fine, I'll sign the order. |
| MS. COLTHIRST: | Good morning, Your Honor. |
| THE COURT: | Yes. |
| MS. COLTHIRST: | Jennipher Colthirst on behalf of Mr. Rufus Spearman. It's true, Mr. Spearman's father did recently retain me to represent his son. Apparently there's been a breakdown in communication between Mr. Spearman and Mr. Evans, and Mr. Spearman can further elaborate on that. |
| THE COURT: | Well, Mr. Spearman has had a breakdown previously with counsel and Mr. Spearman – is he here? |
| MS. COLTHIRST: | Yeah. |
|   . . . . | |
| MS. COLTHIRST: | Your Honor, realistically speaking, because I was just retained, I don't even have all of the discovery. I need to respectfully – |

| | |
|---|---|
| THE COURT: | You shouldn't retain in if you're not prepared to proceed with trial. This is the oldest case I have on my docket. It is going to trial today. If you wish to proceed, that's fine. If not, then Mr. Evans will be proceeding. He's the second attorney that I've appointed in this case to represent Mr. Spearman. And you should not take a case, Ms. Colthirst, if you're not prepared to proceed with a set firm trial date which is today's date, the 28th of August. You should refund the client. |
| MS. COLTHIRST: | I was here Friday and I did seek an opportunity to adjourn this matter. |
| THE COURT: | Doesn't matter. I would have denied it anyhow as the trial judge and as presiding judge.<br>        All right. Record should reflect that Mr. Spearman is present.<br>        Mr. Spearman, you are going to trial today. |
| DEFENDANT: | Okay. |
| THE COURT: | Ms. Colthirst has indicated that your father has retained her and Mr. Evans is here prepared, ready to proceed to go to trial. And if Ms. Colthirst takes a trial, takes a case – and I have a firm trial date contract signed by you and the defendant, defense counsel and the prosecution and we set a firm trial date. I had to adjourn the last – this matter previously because of the fact that you did not get along with counsel so I had to appoint Mr. Evans to replace prior counsel, and I set this date as a firm trial date in this matter. And if Ms. Colthirst wishes to intervene on your behalf, she intervenes with the understanding that she will be proceeding to trial today. |
| DEFENDANT: | Well, how will she be prepared for the trial today, Your Honor? She wouldn't be able to be prepared, there's no way. |
| THE COURT: | Mr. Spearman, you had months to hire an attorney if you so desired. |
| DEFENDANT: | Well – |
| THE COURT: | And you're not going to come up with an attorney on Friday before the trial and say I want an adjournment. You are my oldest case. Mr. Evans is able, competent and prepared to proceed to trial and we will be proceeding to trial. |
| MS. COLTHIRST: | Your Honor, um, what concerns me is not only the fact that Mr. Spearman does have a right to counsel of his own choice but also the fact that he has presented me with potential alibi witnesses, witnesses that, according to Mr. Spearman, have not been contacted. I think it's only fair for Your Honor to allow for an adjournment, even if it's a brief one – |
| THE COURT: | Denied. |

12

| | |
|---|---|
| MS. COLTHIRST: | – to seek the witnesses would could assist him in his defense, Your Honor. |
| THE COURT: | The request for an adjournment is denied.  Mr. Spearman has had months, if nor year [sic], to advise the court of potential alibi witnesses and has failed to do so. |
| DEFENDANT: | I have brought this up to Mr. Evans, Your Honor. . . . There's been an existing dispute over Mr. Evans and I whether a particular defense should be.  It has resulted in a complete breakdown in our attorney/client record.  Also attorney Evans has performed inadequately when he has failed to investigate the defenses by myself such as alibi defense of which Attorney Evans' failure to investigate all that has resulted in withdrawing a crucial defense from the case.  Therefore, if I am forced to stand trial with Attorney Evans as my court appointed counsel, I will not have the effective assistance of counsel I am entitled to. |

Trial Tr., Vols. I & II, at 4-9.  Counsel and the trial judge then adjourned to chambers.  After

discussing the matter in chambers, the judge indicated on the record that the trial date had been set

back on March 24, 2000, and that petitioner had previously been granted substitute counsel.  The

judge also indicated that although he had received many pieces of correspondence and motions from

petitioner, petitioner had not mentioned alibi at all.  *See id.* at 10.  Petitioner's appointed counsel

indicated that he had spoke with petitioner on a number of occasions, that petitioner had not

mentioned any alibi witnesses, and that the only report he had not reviewed was the ballistics report,

because that report had not yet been completed by the police.  *See id.* at 14-15.  The trial judge

granted a two day continuance, indicating that either Mr. Evans of Ms. Colthirst could proceed as

petitioner's counsel at his option, but that a further continuance would not be granted.  *See id.* at 11-

12, 16-17, 21.

On August 30, the parties again appeared for trial.  At that time, Ms. Colthirst withdrew as

counsel, citing her lack of time to prepare.  Petitioner spoke to the court, detailing the areas of

disagreement he had with Mr. Evans, specifically noting Mr. Evans's failure to file certain motions

13

and to interview his alibi witnesses. *See id*. at 27-30. The trial judge rejected petitioner's request that Ms. Colthirst be given additional time to prepare, noting that petitioner had previously been granted a substitution of counsel, Mr. Evans was prepared and had a reasonably strategic basis for not filing the motions requested by petitioner, and petitioner had over five months in which to retain counsel. *See id*. at 30-32. Further, Mr. Evans indicated for the record that he was prepared to proceed and that he was happy to continue representing petitioner. *See id*. at 32.

On appeal, the Michigan Court of Appeals concluded that the trial court did not abuse its discretion in denying additional time for retained counsel to prepare for trial. The court reasoned that "defendant failed to identify a bona fide reason for replacing his court-appointed attorney with newly retained counsel," because counsel's failure to file motions was a strategic decision committed to counsel's discretion, and because petitioner had not given notice of his alibi witnesses or shown that they would have provided favorable testimony. *Spearman*, 2003 WL 1904348, at *1, slip op. at 2. Further, the court explained, petitioner "was negligent in asserting his right because he waited until a week before trial to retain substitute counsel." *Id*. The court also explained that the trial court was justified in determining that petitioner's case, which was the oldest on its docket and had previously been adjourned at petitioner's request, should not be further delayed. *See id*. Finally, the court explained that petitioner was not prejudiced, because a "review of the trial transcript shows that defendant's appointed attorney was well-prepared to defend him, and thoroughly cross-examined the prosecution witnesses." *Id*.

The Court should conclude that this determination was a reasonable application of the Supreme Court's choice of counsel precedents, and thus that petitioner is not entitled to habeas relief on this claim. As noted above, while there is a constitutional right to counsel of one's choice, that

14

right is not absolute.  Importantly, the Sixth Amendment does not guarantee a defendant the right to actually have the counsel of his choice; rather, the amendment guarantees "a fair opportunity to secure counsel of his choice." *Powell*, 287 U.S. at 53.  Here, petitioner was not denied this opportunity: the trial court was prepared to substitute counsel and allow retained counsel to proceed with the trial.  It is true that the trial court was not willing to grant a continuance beyond two days for retained counsel to prepare.  This decision, however, amounted to a constitutional violation only if it constituted "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

Here, the Michigan Court of Appeals could reasonably conclude that there was not a justified request for delay, and that the trial court's ruling did not reflect an "unreasoning and arbitrary" insistence upon expeditiousness.  Although the trial date had been set for over five months, petitioner did not retain counsel until the week before trial, and retained counsel herself did not file an appearance until the last business day before trial was set to commence.  Further, although petitioner claimed that counsel had failed to follow some of his instructions and that he and counsel disagreed on defense strategy, he has not demonstrated that there was an irrepressible conflict or that there was a complete breakdown of the attorney-client relationship, and Mr. Evans's statements to the court belie any such claim.  In light of this fact, the closeness of the request for new counsel to the trial date, petitioner's opportunity to retain counsel well before the trial date, and the length of time that the case had been pending, and Mr. Evans's assurance that he was prepared to proceed with trial, the trial court could reasonably conclude that petitioner was not entitled to a further continuance to secure retained counsel's assistance, as a number of courts have found in similar

circumstances.  *See, e.g.*, *United States v. Miller*, 405 F.3d 551, 557 (7th Cir. 2005); *United States v. Armstrong*, 112 F.3d 342, 345 (8th Cir. 1997); *United States v. Poston*, 902 F.2d 90, 97 (D.C. Cir. 1990); *Mack v. Singletary*, 142 F. Supp. 2d 1369, 1379-80 (S.D. Fla.), *aff'd sub nom. Mack v. Secretary for Dep't of Corrections*, 273 F.3d 1111 (11th Cir. 2001) (unpublished); *Neal v. Grammar*, 769 F. Supp. 1523, 1534 (D. Neb. 1991), *aff'd*, 975 F.2d 463, 467 (9th Cir. 1992).  It therefore follows that the Michigan Court of Appeals's conclusion that the trial court had not abused its discretion did not involve an unreasonable application of clearly established federal law. Accordingly, the Court should conclude the petitioner is not entitled to habeas relief on this claim.

E.      *Defective Oath (Claim II)*

        In his second claim, petitioner contends that the jury was given a defective oath, and that this defect in the proceedings was a structural error requiring reversal of his conviction.  At trial, after the jury was seated, the clerk of court administered the following oath: "Do you solemnly swear or affirm that you will truthfully deliberate this case according to the evidence and the laws of this state?"  Trial Tr., Vols. I & II, at 195.   Petitioner contends that this oath failed to comply either with the statutory oath required in Michigan, or the Michigan Court Rule setting forth the juror oath. *See* MICH. COMP. LAWS § 768.14 ("You shall well and truly try, and true deliverance make, between the people of this State and the prisoner at bar, whom you shall have in charge, according to the evidence and the laws of this state; so help you God."); MICH. CT. R. 2.511(G) ("Each of you do solemnly swear (or affirm) that, in this action now before the court, you will justly decide the questions submitted to you, that, unless you are discharged by the court from further deliberation, you will render a true verdict, and that you will render your verdict only on the evidence introduced and in accordance with the instructions of the court, so help you God.").  The Michigan Court of

16

Appeals rejected petitioner's claim, concluding that (1) the court rule governing jury selection in criminal trials, MICH. CT. R. 6.412, requires only that the jury be sworn, but does not prescribe a particular form of oath; and (2) the statute it is inapplicable because, under the Michigan Constitution, Rule 6.412 controls over the statute. *See Spearman*, 2003 WL 1904348, at *2, slip op. at 2-3. The court concluded that "[t]he oath administered here was satisfactory because it plainly and simply stated that the jurors would follow the trial court's instructions and decide the case according to the evidence." *Id.*, slip op. at 3. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

It is well established that habeas review does not lie for errors of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Petitioner has cited, and I have found, no cases requiring a particular form of oath be sworn to by the jurors as a matter of federal constitutional law. On the contrary, the swearing of the jury generally involves a matter of state law that is noncognizable in federal habeas review. *See Mayo v. Lynaugh,* 882 F. 2d 134, 137 (5th Cir. 1989). Thus, even if the oath was defective under Michigan law, petitioner is not entitled to habeas relief on this claim.[2]

F.   *Weight and Sufficiency of the Evidence (Claims III & IV)*

In his third and fourth habeas claims, petitioner contends that there was insufficient evidence

---

[2]Respondent contends that this claim is barred by petitioner's procedural default in the state courts–namely, his failure to object to the oath administered at trial. Because this claim is clearly without merit, the court may reject the claim on the merits without resolving the procedural default issue. *See Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (noting that procedural default issue should ordinarily be resolved first, but denying habeas relief on a different basis because resolution of the default issue would require remand and further judicial proceedings); *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (internal citations omitted) (while procedural issues in a habeas case should ordinarily be resolved first, "judicial economy sometimes dictates reaching the merits of [a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated.").

to support his conviction, and that the verdict was against the great weight of the evidence.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

      1.     *Sufficiency of the Evidence (Claim III)*

      *a.  Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences, and resolve conflicting inferences from the record in favor of the prosecution.  *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992).  In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision.  Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S.

at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).  Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).  Accordingly, it is necessary to examine the elements of murder under Michigan law.

Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment.  *See* MICH. COMP. LAWS § 750.317.  To establish second degree murder, the prosecution must show that the defendant killed a human being with malice aforethought.  In order to show malice aforethought, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result.  *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980).  Certain additional elements elevate second degree murder to first degree murder, which is punishable by a mandatory term of nonparoleable life imprisonment.  These include murder done with premeditation or committed in the course of certain enumerated felonies.  *See* MICH. COMP. LAWS § 750.316(1)(a), (b).

Under Michigan law, "[p]remeditation is measured in time; time to permit a reasonable person to subject the nature of his response to a second look."  *People v. Brown*, 137 Mich. App. 396, 407, 358 N.W.2d 592, 597 (1984).  "The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing."  *People v. Anderson*, 209 Mich. App. 527,

537, 531 N.W.2d 780, 786 (1995). Relevant factors include the relationship of the parties, the defendant's actions prior to the killing, the circumstances of the killing, and the defendant's conduct after the killing. *See id.*; *Brown*, 137 Mich. App. at 407, 358 N.W.2d at 597. Further, because first degree murder requires premeditation and deliberation rather than simply malice aforethought (as is required for second degree murder), the actor must have the specific intent to kill in order to be convicted of first degree murder. *See People v. Hart*, 437 Mich. 898, 898, 465 N.W.2d 328, 328 (1991); *People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 715 n.102, 299 N.W.2d 304, 320 n.120 (1980).

### *b. Analysis*

Petitioner contends that the evidence was insufficient to support his conviction in two respects. First, petitioner argues that there was insufficient evidence to conclude beyond a reasonable doubt that he was the shooter. Second, he contends that even if there was sufficient evidence that he was the shooter, there was insufficient evidence presented to establish that he premeditated and deliberated the killing of Toma Johnson. The Court should conclude that petitioner is not entitled to habeas relief on either of these bases.

As to the identity of the shooter, the Michigan Court of Appeals concluded that there was sufficient evidence presence to establish that petitioner was the shooter because

> three witnesses testified that defendant told them that he killed Toma Johnson. Further, defendant admitted details that were consistent with Cassandra McIntosh's account of the killing. . . . Physical evidence also corroborated the prosecution's theory. Specifically, gunshot residue was found on the clothes that defendant wore, and the gun that defendant hid in the alley was loaded with hollow point bullets, which was consistent with the type of bullet that killed Johnson.

*Spearman*, 2003 WL 1904348, at *2, slip op. at 3. This determination was reasonable. As the court of appeals recognized, Vaneeka Barksdale, Darshuan Barksdale, and Vikki Woods all testified that

20

petitioner admitted to them that he killed Toma Johnson.  It was for the jury to determine whether they were telling the truth or lying.  A reviewing court, whether on direct appeal or habeas review, "do[es] not make credibility determinations in evaluating the sufficiency of the evidence."  *United States v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *Walker v. Russell*, 57 F.2d 472, 475-76 (6th Cir. 1995); *see also*, *United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story.").  The fact that there was little physical evidence and no eyewitness evidence, and that there were inconsistencies in the witnesses' testimonies, does not alter this conclusion.  "The fact that the testimony is contradictory does not mean that evidence is insufficient, only that the jury must make credibility determinations."  *Government of the Virgin Islands v. Isaac*, 50 F.3d 1175, 1179 (3d Cir. 1995).  It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution.  *See Jackson*, 443 U.S. at 326; *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996).

With respect to petitioner's claim that there was insufficient evidence of premeditation and deliberation, the Michigan Court of Appeals reasoned that "[t]he evidence also demonstrated that defendant had time to reflect on what he was doing when he walked from the party store to McIntosh's house, and again during the brief exchange he had with Johnson before shooting him."  *Spearman*, 2003 WL 1904348, at *2, slip op. at 3.  This determination was likewise reasonable.  Even assuming that petitioner did not possess the intent to kill Johnson prior to arriving at the McIntosh home, evidence presented at trial showed that Johnson answered the door and, after indicating that Toya was not home tried to close the door.  Petitioner then pushed the door open and

shot Johnson.  *See* Trial Tr., Vols. I & II, at 240; Vol. III, at 39, 111-12, 254.  Further, contrary to petitioner's argument, there was evidence presented that petitioner did premeditate an intent to kill Johnson prior to arriving at the door to the house.  Specifically, there was evidence that petitioner admitted that he shot Johnson because he believed Johnson had hit Darshuan Barksdale.  *See id.*, Vol. III, at 36, 51, 252-53.  Based on this series of events, a rational jury could conclude that petitioner had adequate time to reflect on his actions, and that he formed the intent to kill Johnson prior to firing the fatal shot.

Petitioner also contends that there was insufficient evidence to establish premeditation because he was intoxicated, having drunk alcohol and smoked marijuana on the night of the murder. To negate a specific intent on the basis of voluntary intoxication, it would not have been enough for petitioner to show that he was under the influence of crack cocaine, or even that his intoxication affected his judgment.  Rather, petitioner would have had to have shown that he was "intoxicated to the point at which he was incapable of forming the intent to commit the charged crime."  *People v. Mills*, 450 Mich. 61, 82, 537 N.W.2d 909, 920 (1995); *People v. Savoie*, 419 Mich. 118, 133-34, 349 N.W.2d 139, 146 (1984); *People v. King*, 210 Mich. App. 424, 428, 534 N.W.2d 535, 536 (1995).  Here, petitioner did not present a voluntary intoxication defense, and there was circumstantial evidence that petitioner was not intoxicated to the point that the could not form the intent to kill.  For example, petitioner was able to recall to the other witnesses the events surrounding the murder, and to describe the murder in detail.  *See Wiley v. Wainwright*, 793 F.2d 1190, 1194 (11th Cir. 1986); *McNair v. Campbell*, 307 F. Supp. 2d 1277, 1330-31 (M.D. Ala. 2004); *United States ex rel. Gill v. Gramley*, 16 F. Supp. 2d 924, 934 (N.D. Ill. 1998).  Further, after the murder petitioner took steps to flee the scene and to conceal his crime by changing clothes and

22

hiding the gun.  *See Reid v. True*, 349 F.3d 788, 800 (4th Cir. 2003); *Gill*, 16 F. Supp. 2d at 934.

Thus, there was sufficient evidence that petitioner was capable of forming the intent necessary for

a first degree murder conviction.

Accordingly, the Court should conclude that the prosecution presented sufficient evidence

to establish beyond a reasonable doubt both that petitioner shot Johnson, and that he premeditated

the murder.  Thus, the Michigan Court of Appeals's rejection of this claim was reasonable, and

petitioner is not entitled to habeas relief.

2.      *Weight of the Evidence (Claim IV)*

Petitioner also contends that the jury's verdict was against the weight of the evidence, and

that the trial court erred in denying his motion for a directed verdict or new trial on this basis.  The

Court should conclude that this claim is not cognizable on habeas review.

As noted above, it is well established that habeas review is not available to correct errors of

state law.  *See Estelle*, 502 U.S. at 67-68 (1991) ("Today, we reemphasize that it is not the province

of a federal habeas court to reexamine state-court determinations on state-law questions.").  The

federal constitution requires only that the evidence be sufficient to sustain the conviction under the

standard established in *Jackson v. Virginia, supra*.  Where the evidence is sufficient as a matter of

due process, a claim that the verdict was against the weight of the evidence presents a state law issue

which is not cognizable on habeas review.  *See Douglas v. Hendricks*, 236 F. Supp. 2d 412, 435-36

(D.N.J.  2002); *Dell v. Straub*, 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002) (Friedman, J.); *Correa

v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001); *cf. Tibbs v. Florida*, 457 U.S. 31, 44 (1982)

(noting in a different context that "trial and appellate judges commonly distinguish between weight

and sufficiency of the evidence.").  In short, "[a] federal habeas court has no power to grant habeas

23

corpus relief because it finds that the state conviction is against the 'weight of the evidence.'" *Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir. 1985).

Thus, the only question here is whether the evidence was constitutionally sufficient to prove all of the elements of the offense for which petitioner was convicted beyond a reasonable doubt. Because the evidence was sufficient under *Jackson v. Virginia*, petitioner is not entitled to habeas relief on his weight of the evidence claim.

G.      *Reading Back of Testimony (Claim V)*

Petitioner next contends that the trial court denied him a fair trial by foreclosing any possibility of having testimony read back to the jury during their deliberations. After the jury had begun deliberating, it sent a note to the judge asking for certain items. This note included an unspecific request for "testimonies." *See* Trial Tr., Vols. IV, V & VI, at 187. The trial judge responded to the jury's request as follows:

> The second – but as far as the testimony is concerned, right now I'm, while you're deliberating, addressing other matters. And what my court reporter takes down is basically equivalent to Egyptian hieroglyphics. It has not been typed nor will it be typed in the very near future. Because we're addressing other matters which are not related to this case and if in the interim you are very specific as to what you would like, then you can indicate that, but you can – it will be still a while before we can get that transcription or transcribing what is in my court reporter's notes. The – but in the interim you have to rely on your collective memory as to the testimony of the witnesses that testified in this case.

*Id*. at 187-88. The jury made no further, specific request for any testimony.

Petitioner's claim fails for two reasons. First, petitioner has not cited to, nor have I located, any case holding that a blanket prohibition on rereading testimony is impermissible as a matter of *federal constitutional* law, as is necessary for the claim to be cognizable on habeas review. At a minimum, this absence of jurisprudence makes it impossible to conclude that the Michigan Court

of Appeals's rejection of petitioner's claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" so as to warrant habeas relief under 28 U.S.C. § 2254(d)(1). Further, any recognition of such a constitutional rule in this case could not be applied to petitioner's benefit under the non-retroactivity principle established in *Teague v. Lane*, 489 U.S. 288 (1989), to the extent that *Teague* retains any individual force apart from the AEDPA amendments to § 2254. *See Friday v. Straub*, 175 F. Supp. 2d 933, 939 (E.D. Mich. 2001) (Gadola, J.).

Further, even applying the standards applied by the federal courts in direct appeals of federal criminal convictions, petitioner's claim fails. The decision whether to reread testimony is "uniquely committed to the discretion of the trial court." *United States v. Crowley*, 285 F.3d 553, 561 (7th Cir. 2002); *see also*, *Gibbs v. Bolden*, 65 Fed. Appx. 519, 521-22 (6th Cir. 2003). Here, the trial judge did not deny the jury's request for the testimony outright. Rather, the judge explained that transcripts were not available and that reading of the testimony requested would take a significant amount of time. She ultimately left it to the jury, however, to decide whether it still wanted to hear the testimony. There was no abuse of discretion by the trial judge in responding to the jury's request in this manner. *See United States v. Gill*, 75 Fed. Appx. 322, 328 (6th Cir. 2003); *cf. Gittens v. Scully*, 737 F. Supp. 840, 843 (S.D.N.Y. 1990) (no abuse of discretion where trial judge did not deny outright jury's request for testimony, but postponed reading of testimony until jury had deliberated further). Further, the trial judge could reasonably conclude that reading back the testimony was not warranted under the circumstances of the case, where compliance with the jury's request would have been difficult and time-consuming considering the volume of testimony it wished to have read-back. *See United States v. Boulerice*, 325 F.3d 75, 85 (1st Cir. 2003) (difficulty in complying with request

is a valid reason for refusing to reread testimony); *United States v. Rodgers*, 109 F.3d 1138, 1143 (6th Cir. 1997) (same); *United States v. Krout*, 66 F.3d 1420, 1433 (5th Cir. 1995) (court may refuse to reread testimony where doing so would take an inordinate amount of time); *Cottrel v. New York*, 259 F. Supp. 2d 300, 306 (S.D.N.Y. 2003) (same).   Finally, the trial court did not abuse its discretion in denying the jury's non-specific request for the transcripts of witness testimony.  *See People v. Sullivan*, 167 Mich. App. 39, 48-49, 421 N.W.2d 551, 556 (1988) (court did not error in instructing jury to narrow its request for testimony); *People v. Williams*, 134 Mich. App. 639, 643, 351 N.W.2d 878, 880 (1984) (same). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

## H.    *Prosecutorial Misconduct (Claim VI)*

Petitioner next contends that he was denied a fair trial by several instances of prosecutorial misconduct.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### 1.    *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (internal quotation omitted).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally

26

placed before the jury; and the strength of the competent proof to establish the guilt of the accused."

*Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted).

In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and

persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

    2.    *Analysis*

*a. Shifting Burden of Proof*

Petitioner first contends that the prosecutor impermissibly shifted the burden of proof.

During cross-examination of petitioner, the prosecutor elicited from petitioner that he thought the

three prosecution witnesses were lying "to protect[] this person named Bud." The prosecutor then

asked, "this is the first time we've ever heard about this theory, isn't it?" Trial Tr., Vols. IV, V &

VI, at 68; *see also*, *id.* at 104. During rebuttal argument, the prosecutor responded to defense

counsel's argument relating to Bud, stating: "Who is Bud, who is this person, where does he come

from, why are we using a person named Bud? You want me to run down the street and look for

some person named Bud? That's what he wants you to do." *Id.* at 157. Further, during rebuttal

argument, the prosecutor responded to defense counsel's discussion of petitioner's alibi, stating:

> An alibi? Don't you come up here and talk about an alibi unless you're
> presenting an alibi. But guess what? You're not going to hear that. You know why?
> Because there isn't one. His alibi witness is a person who came up there on the stand
> and identified him, Darshuan. That is the alibi witness.

*Id.* at 158.

The court should conclude that these comments were not improper. While it is true that a

criminal defendant has no duty to testify or come forward with any evidence, once he does so a

prosecutor is permitted to comment on that evidence. Here, the prosecutor's comments were merely

"a proper way of arguing that the [petitioner's] argument was mere speculation unsupported by the

evidence." *United States v. MMR Corp.*, 907 F.2d 489, 502 (5th Cir. 1990). "The state prosecutor was not suggesting to the jury that the petitioner was obligated to prove his innocence. Rather, he was arguing that the petitioner's . . . testimony was unsupported and not worthy of belief. Thus, the prosecutor's comments did not shift the burden of proof to the defense and did not violate the petitioner's constitutional rights." *March v. Bock*, No. 00-CV-10495, 2003 WL 21488691, at *8 (E.D. Mich. June 12, 2003) (Lawson, J.). Further, any ambiguity that the prosecutor's argument may have created for the jury on the matter of the burden of proof was cured by the trial court's instructions on the proper burden of proof. *See Scott v. Elo*, 302 F.3d 598, 603-04 (6th Cir. 2002); *Lugo v. Kuhlmann*, 68 F. Supp. 2d 347, 369 (S.D.N.Y. 1999). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Commenting on Petitioner's Silence

Petitioner also contends that the prosecutor impermissibly commented on his silence. First, during cross-examination the prosecutor questioned petitioner about his statement to the police, asking petitioner: "And never at any time did you say anything and bring to anybody's attention about this Bud and the clothing or anything else, right?" Trial Tr., Vols. IV, V & VI, at 77. The prosecutor reiterated during closing argument that petitioner had not informed the police about Bud. *See id*. at 133. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Although it is a constitutional violation for the prosecution to use a defendant's post-arrest silence to impeach exculpatory testimony given by the defendant at trial, *See Doyle v. Ohio*, 426 U.S. 610, 619 (1976), *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who

28

voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all. *Anderson v. Charles*, 447 U.S. 404, 408 (1980). Here, the prosecutor did not comment in his questioning and closing argument on the petitioner invoking his right against self-incrimination. Instead, the prosecutor focused on the inconsistencies between petitioner's statement to the police and his testimony in court, which was proper.

### c.  Denigrating Petitioner

Petitioner next contends that the prosecutor improperly denigrated him during closing and rebuttal arguments. During closing argument the prosecutor discussed why the Barksdales were reluctant to come forward and speak with the police: "Every one of them, all three of them said that man is crazy, he's crazy. Do you blame them for not talking to the police outright? I don't know. I don't know if I'd be too hip on going into the police station and saying, well, this is what's going on and this guy's crazy and he's out on the street." Trial Tr., Vols. IV, V & VI, at 124. The prosecutor reiterated this point during rebuttal argument. *See id*. at 138. The prosecutor also suggested that the witnesses were not lying because their testimonies might cause petitioner or his family to seek retribution. *See id*. at 126. In the context of the trial, however, these comments were a permissible argument that the Barksdales were credible because they were testifying in spite of their fears of petitioner. Further, the comments, even if improper, were not so egregious as to deny petitioner a fair trial. *Cf. Kappos v. Hanks*, 54 F.3d 365, 367-68 (7th Cir. 1995) (petitioner not denied a fair trial where prosecutor referred to him as a "murderer" and "artful liar").

### d.  Vouching for Witnesses

Petitioner next contends that the prosecutor impermissibly vouched for the credibility of his

witnesses.  Petitioner points to the following comments of the prosecutor during closing and rebuttal argument as indicative of improper vouching: (1) noting that the three prosecution witnesses' testimonies about petitioner's "one shot to the dome" boast was "clear and concise," *see* Trial Tr., Vols. IV, V & VI, at 118; (2) explaining that Darshuan's testimony was credible by noting that she testified she did not see petitioner with the gun, and stating "[b]ut see, that's an honest witness. That's a witness who is not a professional witness," *id*. at 131; (3) noting that the witnesses had no motivation to lie and rhetorically asking, if they were lying, "why is there no deviation in their story?" *id*.; (4) stating "[a]nd to have – I honestly didn't expect Darshuan Barksdale to come in here and not try to help her boyfriend out like 90 percent of my other cases, but she spoke the truth," *id*. at 138-39; and (5) stating "[t]here may be things you didn't hear about in this trial.  I guarantee the Barksdales didn't want to be hear or Vikki Woods didn't want to be here," *id*. at 163.  The Court should conclude that these statements did not amount to impermissible vouching.

Improper vouching occurs either (1) "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness," or (2) through "comments that imply that the prosecutor has special knowledge of facts not in front of the jury."  *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); *see also*, *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001).[3]  Here, the prosecutor's comments did not place the prestige of the government behind the witness by making personal assurances of a witness's veracity, nor did the prosecutor imply that he knew of facts that had not been introduced.  Rather, the prosecutor pointed to the lack of evidence that the

---

[3]Some cases referring to only the first type of comment as "vouching" and describe the second type of comment as "bolstering."  *See Francis*, 170 F.3d at 551.

witnesses had a motive to lie, and suggested that the jury use its common sense in evaluating

petitioner's argument that these witnesses were not credible.  Thus, the prosecutor's comments were

merely a fair characterization of the evidence presented to the jury based on his summation of that

evidence.  As such, they did not constitute impermissible vouching for the credibility of the

witnesses or the guilt of petitioner.  *See, e.g.*, *Nichols v. Scott*, 69 F.3d 1255, 1283 (5th Cir. 1995)

(comment "is permissible to the extent that it draws a conclusion based solely on the evidence

presented.") (internal quotation omitted); *United States v. Grey Bear*, 883 F.2d 1382, 1392 (8th Cir.

1989); *Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (prosecutor may argue permissible

inferences from the evidence); *United States ex rel. Williams v. Washington*, 913 F. Supp. 1156,

1163 (N.D. Ill. 1995) (prosecutor's assertion during closing argument that the defendant had "lied"

did not deprive petitioner of a fair trial where "the prosecution's statements were reasonable

inferences drawn from the physical evidence and witness testimony[.]").

### e.  Misstating the Law

Petitioner next argues that the prosecutor committed misconduct by misstating the law

relating to premeditation and deliberation.  During closing argument, the prosecutor described

premeditation and deliberation thusly:

> I mention this now because a lot of times when you're reviewing the
> instructions on premeditation and deliberation, a lot of people think that, for
> example, you have to plot it out on paper, you have to think of it days and days in
> advance, that it's a conspiracy.  That is not premeditation and deliberation.
> The judge will instruct you that premeditation, there is no set standard for.
> It's up to you to decide, and it's up to you to decide in the sense that it has to give the
> defendant an opportunity to take a second look at his actions.  And plain and simple,
> that's what it's about.  And the law does not tell us what that time period is but we
> know it can be seconds, it can be minutes, it can be hours.
> I use the analogy of the running the red light or the yellow light.  Got a lot of
> times when people run that yellow light, you think can you make it.  Are there police
> around, do you run the light, do you look around for the police as you run the light,

31

> which is technically not doing anything wrong until you run the red.  However, that
> is an example of premeditation and deliberation.  That's how short of a period – of
> a period it can be, that's how short it can be.  And what is that, brief seconds, not
> even a second?

Trial Tr., Vols. IV, V & VI, at 119-20.

This comment did not misstate the law of premeditation and deliberation.  The prosecutor

clearly stated that all that is required is an opportunity for the defendant "to take a second look at

his actions," and that no set time period for reflection is required.  This is consistent with well-

established Michigan law on premeditation and deliberation.  As another judge of this Court has

explained: "Premeditation and deliberation require sufficient time to allow the defendant to take a

second look at his or her actions.  The time interval may be minimal.  A sufficient time lapse to

provide an opportunity for a 'second look' may be merely seconds, minutes, or hours or more,

dependant on the totality of the circumstances surrounding the killing." *Johnson v. Hofbauer*, 159

F. Supp. 2d 582, 596 (E.D. Mich. 2001) (Tarnow, J.) (citations omitted); *see also*, *People v. DeLisle*,

202 Mich. App. 658, 660, 509 N.W.2d 885, 888 (1993), *denial of habeas corpus aff'd by DeLisle*

*v. Rivers*, 161 F.3d 370, 389 (6th Cir. 1998) (en banc).

Further, even if the prosecutor's comment misstated the law, petitioner cannot show that he

was denied a fair trial by the misstatement.  The trial court instructed the jury on the element of

premeditation and deliberation, *see* Trial Tr., Vols. IV, V & VI, at 170,  and petitioner does not

contend that the trial court's instruction was erroneous.  Further, the court instructed the jury that

it "must take the law as I give it to you.  If a lawyer says something different about the law, follow

what I say." *Id*. at 164.  Because the trial court correctly stated the law and admonished the jury that

only its instructions on the law were to be followed, petitioner cannot show that he was prejudiced

by the prosecutor's alleged misstatement of the law.  *See United States v. Wadlington*, 233 F.3d

1067, 1079 (8th Cir. 2000); *United States v. Gonzalez-Gonzalez*, 136 F.3d 6, 9 (1st Cir. 1998).

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### f. Arguing Facts Not in Evidence

Petitioner also contends that the prosecutor argued facts not in evidence.  Specifically, he

points to the prosecutor's comments on police interrogation techniques, used by the prosecutor to

rebut petitioner's claim that the Barksdales and Vikki Woods had collaborated to implicate

petitioner.  During closing argument the prosecutor stated:

> And like I asked in the questioning, you know, they didn't all sit in the room together because I can guarantee you the first thing they said to Darshuan and the first thing they said to Vikki is cut it, let's come clean now.  We already talked to Vaneeka, already talked to her.  That's what police do, plain and simple, that's what they do.  They're going to separate you and when they get one person, one person's story that they understand that makes the sense and then they aks the other one and the other one, and you know what?  That's why those witnesses are here, and those witnesses are here to testify to their credibility.

Trial Tr., Vols. IV, V & VI, at 125.  Later during closing, the prosecutor responded to petitioner's

contention that he had told the police about Bud, but that they did not write out his statement:

> You think for a minute that any police officer in his right mind – and these are homicide officers.  These are people who do this – bless you – do this every day and separate those witnesses and figure out who's telling the truth and who's not and get a lead and go out to that lead and check his alibi and check his story out, go the next direction and find that person.  You think if Mr. Spearman was talking to the police, don't you think they'd be writing stuff down, because any little detail could trip him up, could put him at the scene which he admits being at, every little thing.

*Id*. at 132.

Contrary to petitioner's argument, the prosecutor's comments did not amount to improper

arguing of facts not introduced into evidence.  Rather, the prosecutor was merely arguing that the

jury should evaluate the testimony of the witnesses and the petitioner in light of common sense.  "It

is well established that juries are allowed to draw upon their own experience in life as well as their

common sense in reaching their verdict.  While common sense is no substitute for evidence,

common sense should be used to evaluate what reasonably may be inferred from circumstantial

evidence." *United States v. Durham*, 211 F.3d 437, 441 (7th Cir. 2000) (internal quotation omitted).

Thus, the prosecutor was permitted to urge the jury to use its common sense in evaluating the

witnesses' testimony.  *See United States v. Catano*, 65 F.3d 219, 228 (1st Cir. 1995); *United States*

*ex rel. Hamilton v. Ellingsworth*, 629 F. Supp. 356, 366 (D. Del. 1988).

### g. *Appealing to Civic Duty and Sympathy of Jury*

Finally, petitioner contends that the prosecutor impermissibly appealed to the civic duty and

sympathy of the jury when he argued:

> Toma Johnson, you know, I just – just as a diversion, in the years of doing this, in
> 12 years of doing this, the saddest part about these cases is it's unfair in the sense
> that it's real easy when you see a person here and then there's a person who's not
> here.  It becomes prejudicial in the sense because that person doesn't have a voice.
> And it's very important when you argue your cases as such with homicides because
> it's not an effort to gain sympathy.  But, see, when we talk about jury selection and
> people look at sympathizing with the defendant, and that's very important because,
> as I said, if somebody has sympathy for somebody starting out, I'm spinning my
> wheels here.
>         If somebody said during the case do you have sympathy for the individual,
> do you have sympathy for the person who's seated here – but you know what?  At
> least he's here, at least he's here to receive that sympathy, because Toma Johnson
> isn't.  Toma Johnson received – was on the receiving end of something [that] had
> nothing to do with him.  He got the door and was executed.

Trial Tr., Vols. IV, V & VI, at 121-22.

For the most part, these comments were not an appeal to the jury to have sympathy for the

victim, but rather an appeal that the jury not have sympathy for petitioner.  In any event, even if the

comments were improper they were not so prejudicial that they denied petitioner a fair trial.  *United*

*States ex. rel. Rockman v. DeRobertis*, 717 F. Supp. 553, 569-70 (N.D. Ill. 1989)(prosecutor's

reference to victim "in his grave crying out for a guilty verdict" did not deprive petitioner of a fair

trial); *Kordenbrock v. Scroggy*, 680 F. Supp. 867, 896-96 (E.D. Ky. 1988)(petitioner was not denied a fair trial where, during the guilt-innocence phase of the trial, the prosecutor admonished the jury not to forget the victim because "he had a right to live."), *rev'd on other grounds*, 919 F.2d 1091 (6th Cir. 1999)(en banc).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

I.      *Ineffective Assistance of Counsel (Claim VII)*

Petitioner next contends that his trial counsel rendered constitutionally deficient performance in a number of respects.  Specifically, petitioner contends that counsel was ineffective for failing to: (1) properly investigate the case and interview witnesses; (2) seek suppression of Darshuan Barksdale's testimony; and (3) object to his appearance at trial in jail clothing.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Id*. at 687.  These two components are mixed  questions of law and fact.  *Id*. at 698.  Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id*. at 697.  If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  *Id.*

35

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2.      *Analysis*

a. *Failure to Conduct Adequate Investigation*

Petitioner contends that counsel was ineffective for failing to properly investigate the case. Specifically, petitioner argues that counsel should have interviewed Daynelle Barksdale and Candace "Tweety" Givens, both of whom were with petitioner at the Woods house on the night of the murder. The Michigan Court of Appeals rejected this claim, concluding that petitioner had "never offered any factual support for his claim that these witnesses could have provided favorable testimony." *Spearman*, 2003 WL 1904348, at *6, slip op. at 6. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

"A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it could have affected the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). With respect to Givens,

36

petitioner has not alleged any testimony that she could have given which would have been favorable to him. Rather, he merely speculates that because she was at Woods's house, she could have exculpated him. Such speculation is not sufficient to establish that counsel was ineffective, or that he was prejudiced by counsel's failure to interview Givens. *See United States v. Farr*, 297 F.3d 651, 658-59 (7th Cir. 2002); *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001); *Bradford v. Wolfenbarger*, No. 04-CV-70862, 2006 WL 508630, at *9 (E.D. Mich. Feb. 28, 2006) (Hood, J.).

With respect to Daynelle Barksdale, petitioner again does not allege what exculpatory evidence she would have given if she had been called at trial. Petitioner does attach to his petition, as Exhibit 2, Daynelle Barksdale's witness statement. If Daynelle's testimony would have mirrored the witness statement, however, her testimony would not have helped petitioner. It is true that, in this statement, Daynelle indicated that she did not hear petitioner say anything about the shooting. This statement alone, however, would not have contradicted the testimony of the prosecution witnesses. In the first place, there is no indication that all of the occupants of the Woods house were all together for the entire evening. Thus, the fact that Daynelle did not hear petitioner confess to the shooting of Johnson would not have precluded the other witnesses having heard him confess. Second, Vaneeka Barksdale testified that petitioner told her about the shooting the following day, not that night at Woods's house. Thus, Daynelle's testimony would not have contradicted Vaneeka's testimony at all. Finally, in her statement Daynelle indicated that petitioner was "acting strange and crazy" when he came back to the house, and confirmed that petitioner ran into the basement. Absent any other indication of what she would have testified if called at trial, Daynelle's statement to the police does not raise a reasonable probability that the result of the proceeding would have been different if she had been interviewed by counsel and called as a witness. Accordingly,

37

the Court should conclude that petitioner is not entitled to habeas relief on this claim.

   b. *Failure to Move to Suppress Testimony of Darshuan Barksdale*

   Petitioner next contends that counsel was ineffective for failing to seek suppression of Darshuan Barksdale's testimony. At trial, Darshuan testified that part of the reason she implicated petitioner in her third statement to the police was that the police had threatened to take away her baby. *See* Trial Tr., Vol. III, at 264. Based on this testimony, petitioner contends that Darshuan's testimony was coerced by the police, and that counsel should have sought to suppress the testimony on that basis. The Michigan Court of Appeals rejected this claim for two reasons. First, the court reasoned that petitioner did not offer "evidence (except two belatedly submitted affidavits) that the police coerced Darshuan into falsely incriminating him. Although Darshuan testified at the preliminary examination and at trial that she incriminated defendant after the police threatened to remove her child, she stated that this prompted her to tell the truth about defendant's involvement in the charged offense." *Spearman*, 2003 WL 1904348, at *6, slip op. at 6-7. Second, the court concluded that, even if this testimony had been suppressed, "[t]wo other witnesses testified that defendant admitted shooting the victim. Additionally, even if Darshuan had not testified about defendant's admission, she still could have testified about her discovery of defendant's gun after he told her where it was hidden. Thus, there was other substantial evidence of defendant's guilt." *Id.*, slip op. at 7. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

   First, it is doubtful that Darshuan's testimony would have been suppressed. It is true that a defendant's "due process rights would be implicated if the subject witness was coerced into making *false* statements and those statements were admitted against defendant[] at trial." *United States v. Gonzalez*, 164 F.3d 1285, 1289 (10th Cir. 1999) (emphasis in original). As the court of appeals

38

noted, however, Darshuan testified that although she was coerced into giving the statement, the coercion had the effect of compelling her to tell the truth, not to falsely implicate petitioner. Further, Darshuan's statement itself was not admitted at trial; thus petitioner would have had to have shown that Darshuan's trial testimony itself was involuntary. *See Douglas v. Woodford*, 316 F.3d 1079, 1092 (9th Cir. 2003). Here, there is no evidence that Darshuan's trial testimony, well removed from the alleged threat to take her child, was the product of the police coercion, and the fact of that coercion was brought out before the jury and was the subject of defense counsel's cross-examination of Darshuan. In these circumstances, suppression of her testimony would not have been required. *See Williams v. Woodford*, 384 F.3d 567, 595-96 (9th Cir. 2004); *United States v. Mattison*, 437 F.2d 84, 84 (9th Cir. 1970) (per curiam).

Second, the Michigan Court of Appeals's conclusion that petitioner was not prejudiced by counsel's failure to seek suppression of Darshuan's testimony was a reasonable one. As the court noted, even absent Darshuan's testimony, two other witnesses testified that petitioner had confessed killing Johnson, and physical evidence corroborated their testimony. Thus, even in the absence of Darshuan's testimony there is not a reasonable probability that the result of the proceeding would have been different. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Failure to Object to Appearance in Jail Clothing

Finally, petitioner contends that counsel was ineffective for failing to object to his appearance at trial in jail clothing. On the first day of trial, petitioner appeared in jail clothing because, he indicated, he was expecting an adjournment based on his retention of new counsel. *See* Trial Tr., Vols. I & II, at 5. The trial court adjourned the trial for two days to allow newly retained

39

counsel to prepare.  After newly retained counsel indicated she was not prepared, the court required

petitioner to proceed with his court appointed attorney.  At that time, the court stated that "[t]he

record should also reflect that Mr. Spearman on Monday was advised and given the opportunity to

wear civilian clothing and has opted to proceed to trial in what we refer to as his – the green outfit

with the Wayne County Jail log on the back and that is Mr. Spearman's option."  *Id.* at 35.  The

following exchange then occurred between the court and petitioner:

| | |
|---|---|
| THE COURT: | . . . .  Mr. Spearman, you understand you have the right to proceed to trial wearing civilian clothes and you opted to come over here this morning wearing your greens, correct? |
| DEFENDANT: | Well, actually had to be five days in advance before my father could drop the greens [sic] off.  I believe Attorney Colthirst asked you to give us that time but we have to proceed today. |
| THE COURT: | You were here on March 24th when I set your trial date for August 28th. |
| DEFENDANT: | But I can't go home and get them. |
| THE COURT: | So you were under the impression that your trial date was to start August 28th and you knew what the – the date as of March, correct? |
| DEFENDANT: | Yes, sir. |

*Id.* at 36.  The trial court then took a recess to address a matter in a different case.  During the recess,

petitioner was provided with a sport coat to wear over his jail uniform.  After the court reconvened,

the following discussion took place between the court, petitioner, and defense counsel:

| | |
|---|---|
| MR. EVANS: | Your Honor, Mr. Spearman and I just kind of talked.  Like to – I kind of critiqued what he was wearing as opposed to what he was wearing.  He would like to change back into the green. |
| THE COURT: | What does he have, his – |
| MR. EVANS: | He's got his prison greens on and we know there's a limitation.  He has prison green pants, a blue sport coat. |
| THE COURT: | White T-shirt. |
| MR. EVANS: | I would just like to have him switch back to what he had before.  I think he looks better.  I think – it's up to him.  We've discussed it.  It's up to him. |
| THE COURT: | Mr. Spearman, I provided because of, you know – I mean it's your option as to what clothing you desire to wear at your |

|                 | trial and you've had over five months' notice and you acknowledge that you needed five days in advance to get your clothing.  So as far as that is concerned, I gave them a jacket to cover.  You want to put your green shirt only.  Only thing is you had a green shirt that said Wayne County Jail on the back of it so I gave you a blue sport coat that we had in the back to cover those letters.  You've taken that off. |
|-----------------|------------------------------------------------------------------|
| DEFENDANT:      | You want me to try to put that over that?                        |
| THE COURT:      | If you want to put the blue sport coat over the green jacket, that's fine too. |
| MR. EVANS:      | We appreciate what you've done.  You know, to me personally I think it looks like, based on his sandals, his footwear, things like that, he looks like he's incarcerated.  Due to the nature of this charge, I don't think, you know, I don't think the jury is – I don't know what they would, you know – |
| THE COURT:      | Well, I just want to make certain that the record's clear that he knew about the five-day rule which he acknowledged earlier which is an administrative rule.  Two, that I've provided him with a sport coat.  You want to try that on over your green shirt.? |
| DEFENDANT:      | I mean, it doesn't matter.  It look – I'll just keep the greens on. |
| THE COURT:      | Okay.  Record should reflect defendant has voluntarily opted to proceed with his greens. |

*Id.* at 36-38.

The Michigan Court of Appeals rejected petitioner's claim.  The court noted the general rule that a defendant's timely request to wear civilian clothing must be granted, but concluded that petitioner's request was not timely.  The court reasoned, therefore, that it was "defendant's own dilatoriness, not ineffectiveness of trial counsel, that caused defendant to appear before the jury in prison garb."  *Spearman*, 2003 WL 1904348, at *6, slip op. at 7.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Even if counsel's performance were deficient, petitioner cannot show that he was prejudiced by counsel's failure to object to his appearance in prison clothing because it is clear from the record

41

that any such objection would have been overruled. Petitioner, trial counsel, and the court discussed the clothing issue at length, as is apparent from the above quoted portions of the transcript. It is further apparent that, although counsel did not lodge a formal objection, the trial court fully considered and rejected petitioner's claim that he should be allowed to obtain civilian clothing. The trial court rejected this plea based on petitioner's failure to timely obtain civilian clothing in accordance with the jail's administrative rules, despite having known for several months the trial date. And the trial court did not err in doing so. *See United States v. Henry*, 47 F.3d 17, 22 (2d Cir. 1995) (defendant not compelled to stand trial in prison clothing where the "court did not affirmatively prevent [him] from wearing civilian clothing, but simply refused [his] failure to make proper arrangements despite receiving ample notice and opportunity."); *Tarpley v. Dugger*, 841 F.2d 359, 361 (11th Cir. 1988); *State v. Zonge*, 973 S.W.2d 250, 257 (Tenn. Ct. Crim. App. 1998) ("[A] trial court's failure to honor a defendant's request not to be tried in prison garb does not amount to state compulsion where the defendant has had a reasonable opportunity to appear in other clothes but fails to do so."). Petitioner thus cannot show a reasonable probability that any objection from counsel would have been successful, and therefore he cannot establish that counsel was ineffective. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

J.      *Cumulative Error (Claim VIII)*

        Finally, petitioner contends that he was denied a fair trial by the cumulative effect of the errors at his trial. The Court should conclude that petitioner is not entitled to habeas relief on this basis. It is true that "[e]rrors which standing alone may be deemed harmless or insufficiently prejudicial to amount to a denial of due process may cumulatively produce a trial setting which is fundamentally unfair." *Payne v. Janasz*, 711 F.2d 1305, 1316 (6th Cir. 1983) (Jones, J., dissenting);

42

*accord Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983). This rule, however, applies only to constitutional errors; the accumulation of non-errors cannot collectively amount to a violation of due process. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999); *McKinnon v. Ohio*, No. 94-4256, 1995 WL 570918, at *12 (6th Cir. Sept. 27, 1995); *Fero v. Kerby*, 39 F.3d 1462, 1475 (10th Cir. 1994). As noted and discussed in this Report, none of petitioner's claims establish constitutional error, and thus his cumulative error claim fails.

K.    *Conclusion*

        In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

        The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR

72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated:3/7/06

> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on March 7, 2006.
>
> s/Eddrey Butts
> Case Manager

44